## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDO GINSBURG, M.D.<br>325 Llanfair Road<br>Wynnewood, Pennsylvania 19096<br><br>and<br><br>BRIAN P. YUSKEVICH, M.D.<br>994 Sandy Ridge Road<br>Doylestown, Pennsylvania 18901,<br><br>Plaintiffs<br><br>v.<br><br>ARIA HEALTH PHYSICIAN<br>SERVICES, f/k/a FHCS PHYSICIAN<br>SERVICES<br>3998 Red Lion Road<br>Philadelphia, Pennsylvania 19114<br><br>and<br><br>ARIA HEALTH SYSTEM, f/k/a<br>FRANKFORD HEALTH CARE<br>SYSTEM, INC.<br>3998 Red Lion Road<br>Philadelphia, Pennsylvania 19114<br><br>and<br><br>RANDY K. METCALF, M.D.,<br>3998 Red Lion Road, Suite 214<br>Philadelphia, Pennsylvania 19114,<br><br>Defendants. | No._____ |

## **COMPLAINT**

Plaintiffs, Edo Ginsburg, M.D. and Brian P. Yuskevich, M.D., by and through their

undersigned counsel, aver as follows in support of their claims against Defendants Aria Health

Physician Services ("Aria HPS") and Aria Health System ("Aria" or "Aria Health") and Randy K. Metcalf, M.D. ("Metcalf" or "Dr. Metcalf"):

## I.      NATURE OF ACTION

1.   This case involves Defendants' repeated violations of Plaintiffs' rights under state and federal civil right statutes as well as their contractual rights under their respective employment agreements.

2.   Plaintiffs are both Medical Doctors and board certified anesthesiologists, who, for the past several years, have been forced to work alongside Metcalf, the Chief Cardiothoracic Surgeon at Aria, under the most egregious of hostile work environments caused by Metcalf's pervasive hostility and bigotry toward ethnic minorities such as Plaintiffs.

3.    Metcalf's conduct  included repeatedly making pejorative references to Plaintiffs' national origin, ethnicity, and disability, exhibiting outrageous hostility toward minorities working at Aria, including Plaintiffs, and even making threats of physical violence against Plaintiffs.

4.   When Plaintiffs reported Metcalf's discriminatory conduct to Aria administrators, Aria violated their own internal policies by failing to discipline Metcalf or otherwise intervene to prevent Metcalf's unlawful behavior.

5.   In fact, in direct violation of Title VII of the 1964 Civil Rights Act ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"), Aria and Metcalf retaliated against Plaintiffs by taking adverse employment action against them for reporting Metcalf's discriminatory behavior.

6.   This action also involves Defendants taking illegal retaliatory action against Plaintiffs for reporting many "serious events" and "incidents" involving Metcalf's patients under Pennsylvania's Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. § 1303.308.

7.   MCARE obligates "health care workers," like Plaintiffs, to report "serious events or incidents" involving patient care to "medical facilities," like Aria, as part of MCARE's comprehensive plan to reduce medical negligence and increase patient safety in Pennsylvania's hospitals and medical facilities.

8.   In this regard, the MCARE statute makes it unlawful for a medical facility like Aria to subject a health care worker to "any retaliatory action" for reporting "serious events or incidents" relating to patient care.

9.   The MCARE statute also specifically states that health care workers who make reports of "serious events" or "incidents" shall have the full protection and remedies available under  Pennsylvania's Whistleblower Law, which prohibits employers from taking retaliatory action against employees who report "wrongful" conduct.

10. In direct violation of MCARE and the Whistleblower Law, Aria retaliated against Plaintiffs for reporting Metcalf's "serious events" and "incidents," which ultimately resulted in both Plaintiffs losing their employment and staff privileges at Aria.

11. Thus, as more fully set forth below, Plaintiffs' claims are grounded in Defendants' violation of Title VII, the PHRA, MCARE and the Whistleblower Law, as well as common law claims for breach of contract, intentional infliction of emotional distress, and assault.

## II.     THE PARTIES

12. Plaintiff, Edo Ginsburg, M.D. ("Dr. Ginsburg"), is an adult individual and a citizen of the Commonwealth of Pennsylvania.  Dr. Ginsburg resides at 325 Llanfair Road, Wynnewood, Pennsylvania 19096.  Dr. Ginsburg was hired by Frankford-Torresdale Hospital (the predecessor in interest of Aria Health) as a staff anesthesiologist in early 1999.  (Dr. Ginsburg's June 1, 2009 employment agreement with FCHS Physician Services and Frankford Healthcare Systems, Aria's predecessors, is attached hereto as Exhibit "A."  The undated amendment to that employment agreement extending Dr. Ginsburg's employment through July 31, 2011 is attached hereto as Exhibit "B.")

13. Plaintiff, Brian P. Yuskevich, M.D. ("Dr. Yuskevich"), is an adult individual and a citizen of the Commonwealth of Pennsylvania.  Dr. Yuskevich resides at 994 Sandy Ridge Road, Doylestown, Pennsylvania 18901.  In February, 2007, Frankford-Torresdale hired Dr. Yuskevich as a staff anesthesiologist to work in the general operating room ("OR") and the cardio-thoracic OR ("CTOR") alongside Dr. Randy Metcalf.  (Dr. Yuskevich's February 12, 2011 employment agreement with Aria Health is attached hereto as Exhibit "C.")

14. Defendant, Aria Health Physician Services, which was formerly known as FHCS Physician Services ("Aria HPS"), is a non-profit Pennsylvania Corporation which, through its affiliation with Defendant Aria Health Care System, provides healthcare in or around Philadelphia County and at all times material to the allegations in this Complaint employed substantially more than fifteen (15) individuals.  Aria HPS may be served at 3998 Red Lion Road, Philadelphia, Pennsylvania 19114.

15. Defendant, Aria Health Care System, Inc., which was formerly known as Frankford Health Care System ("Aria Health"), is, among other things, the corporate body which provides medical services at hospitals at the Torresdale, Frankford, and Bucks County campuses. Aria Health, through its affiliates such as Aria HPS, employs physicians who provide medical services to such hospitals. Aria Health may be served at 3998 Red Lion Road, Philadelphia, Pennsylvania 19114.

16. Aria HPS and Aria Health are sometimes collectively referred to herein as "Aria" or "Aria Health."

17. At all times material to the allegations in this Complaint, Drs. Ginsburg, Yuskevich, and Metcalf were working at Aria Health's Torresdale Hospital campus, which shall be referred to as "the Hospital" or "Torresdale Hospital" throughout this Complaint.

18. Defendant, Randy K. Metcalf, M.D. ("Metcalf" or "Dr. Metcalf"), is a cardiothoracic surgeon, and, at all times material to the allegations set forth in this Complaint, was acting as an agent or employee of Aria HPS and Aria Health. Metcalf may be served at 3998 Red Lion Road, Suite 214, Philadelphia, Pennsylvania 19114.

19. At all times material hereto, Defendants Aria HPS and Aria Health were employers within the meaning of the Federal and Pennsylvania statutes which form the basis for some of Plaintiffs' claims.

20. At all times material hereto, Drs. Ginsburg, Yuskevich, and Metcalf were employees of Aria HPS and Aria Health within the meaning of the statutes which form the basis for some of Plaintiffs' claims.

21. At all times material hereto, Defendants Aria HPS and Aria Health were acting by and through their authorized agents, workmen, and/or employees (including Metcalf), each and all acting within the course and scope of their employment with said Defendants and in furtherance of said Defendants' business interests.

### III.     JURISDICTION AND VENUE

22. The District Court has jurisdiction over the present action pursuant to 28 U.S.C. § 1331 (Federal Question), 42 U.S.C. § 12101 *et seq.* and 42 U.S.C. § 2000e, *et seq.* (Subject Matter), and 28 U.S.C. § 1367 (Supplemental).

23. Venue is proper in the District Court under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) as Defendant Frankford does business within the Commonwealth of Pennsylvania and the events upon which the allegations in this Complaint are based occurred within this district.

24. On August 24, 2011, Drs. Ginsburg and Yuskevich filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of the acts of discrimination alleged herein.  These Charges were cross-filed with the Pennsylvania Human Relations Commission ("PHRC").  (True and correct copies of the EEOC Charges, Dr. Ginsburg's amended charge, and the PHRC Dual Filing Forms are attached hereto as composite Exhibit "D.")

25. On January 9, 2012 and January 27, 2012, the EEOC issued Plaintiffs a Notice of Right to Sue in relation to the EEOC Charges of Discrimination.  (True and correct copies of the Notice of Right to Sue Letters are attached hereto as composite Exhibit "E.")

26. Plaintiffs have fully complied with all administrative prerequisites for the commencement of this action.

## IV.    FACTS COMMON TO ALL COUNTS

27. Dr. Ginsburg was born in Israel and is a disabled veteran as a result of his service in the Israeli Navy.  His ethnicity is Jewish.

28. When Dr. Ginsburg immigrated to the United States he completed his residency in anesthesiology at Case Western University Hospital and completed a cardiac anesthesia fellowship at the Cleveland Clinic Foundation.  Dr. Ginsburg is board-certified by the American Board of Anesthesia.

29. Dr. Ginsburg first became affiliated with Aria's Torresdale Hospital in or about 1999.

30. Dr. Yuskevich was born in the United States, but is ethnically Russian and Lithuanian.  He is also Jewish.

31. Dr. Yuskevich completed his residency in anesthesiology at SUNY Health Science Center, University Hospital, and completed a cardiac anesthesia fellowship at the Cleveland Clinic Foundation.  Dr. Yuskevich is also board-certified by the American Board of Anesthesia.

32. Dr. Yuskevich first became employed at Aria's Torresdale Hospital in or about 2007.

33. Prior to the adverse employment actions giving rise to these claims, both Drs. Ginsburg and Yuskevich administered anesthesia to cardiac patients at Aria's Torresdale Hospital.

34. At the time that Dr. Ginsburg first became affiliated with Aria's Torresdale Hospital in or about 1999, he was the only anesthesiologist assigned to the cardiac operating room and was regularly working alongside Drs. Metcalf and Priest (the two cardio-thoracic surgeons performing surgeries at Frankford Hospital at the time).

35. Eventually, Dr. Metcalf was named the Chief Cardiothoracic Surgeon at Aria's Torresdale Hospital.

36.  While working with Metcalf became at Aria's Torresdale Hospital, Dr.  Ginsburg began to observe Metcalf's uncontrolled fits of anger, disruptive behavior, and blatantly bigoted statements toward minority Hospital staff.

37. For example, in one early instance, in or about 2006, Dr. Andre Belski (an anesthesiologist who also happened to be a Russian Immigrant) entered an operating room attended by both Drs. Ginsburg and Metcalf to ask Metcalf a question about a patient.

38. When Belski approached Metcalf, Metcalf screamed and cursed at him, mocked his Russian accent, called him a "fucking Russian" and told him to "get the fuck out of my operating room."  As Belski walked towards the door to the operating room, Metcalf further yelled "you fucking Russian, go back to Russia."

39. Metcalf would also routinely refer to the Chief of Frankford's Anesthesiology Department, Dr. Clifton Hall, M.D., who is African American with a prosthetic eye, by stating "you can't trust a black guy with one eye."

40.  As Ginsburg would soon learn, Metcalf's attitude towards ethnic minorities (including Drs. Ginsburg and Yuskevich) was pervasive and would only become more so as Metcalf became more powerful as the Chief of Cardiothoracic Surgery at Frankford Hospital.

41.  As Metcalf's conduct towards the minority staff at Frankford Hospital became more and more hostile, the targets of his hostility (including Drs. Ginsburg and Yuskevich) began to report their concerns to administrators within Aria.

42. By way of example, on March 13, 2004, Dr. Harold Cooper, a board-certified anesthesiologist and a member of the Hospital's cardiac surgery team who is also Jewish, wrote a grievance letter to Hospital administration, describing an instance where Metcalf had promised Dr. Cooper the help of additional physician assistants (PAs) for a complicated surgical procedure.

43. According to Dr. Cooper's written grievance, he arrived at Metcalf's Operating Room ("OR") where he found a patient and no PAs.

44. When Dr. Cooper asked Metcalf where the PAs were that he had promised, Metcalf, in front of the entire OR staff and the patient, screamed at Dr. Cooper in a very loud and hostile voice: "You are incompetent and your f…ing Department are a bunch of incompetent people who cannot seem to cover our cases."

45. Dr. Cooper conveyed this incident to Aria's administrators in a grievance letter dated March 13, 2004.  (*See* March 13, 2004, correspondence attached hereto as Exhibit "F.")

46. In another instance in August 2004, Dr. Ginsburg asked Dr. Ashrafe Ewida, an anesthesiologist who also happened to be an immigrant from Egypt, to take a bleeding patient to Metcalf's OR to expedite a procedure.

47. When Dr. Ewida arrived at the OR with the patient, Metcalf, for no apparent reason, began screaming at Dr. Ewida, "raising his hands and fingers," yelling "never, ever give me an order again" in front of the patient and the entire OR staff.

48. Dr. Ewida described Metcalf's conduct as "rage" and completely "unprofessional." He reported this incident to the President of the Medical Staff at the Hospital in an August 23, 2004 correspondence.  (*See* true and correct copy of 8/23/2004 correspondence attached hereto as Exhibit "G.")

49. Despite Dr. Ewida's complaints, Aria administrators took no disciplinary action against Metcalf and never intervened to curb his hostility toward ethnic minorities.

50. In fact, Metcalf's hostility toward Dr. Ewida became so severe he wrote a letter to Aria's administrators resigning from the Cardiac Anesthesia Team in May 2005.  (*See* 5/5/2005 letter attached hereto as Exhibit "H.")

51. In his resignation letter, Dr. Ewida described his repeated attempts to work through Aria's administrators, which included reports of the continued mistreatment and abuse by Metcalf at the "medical staff level, hospital administration level, and surgical chief level." (*Id.*)

52. Despite Aria's published "no tolerance policy" against harassment and hostility in the workplace, even after repeated warnings and complaints about Metcalf's conduct, Aria's administrators took no disciplinary action against Metcalf and allowed Metcalf's conduct to continue unabated, ultimately leading to a hostile work environment that caused Dr. Ginsburg's constructive discharge and Dr. Yuskevich's termination.

53. In fact, as a direct result of Aria's refusal to enforce its "no tolerance policy," Metcalf's hostility, bigoted comments, animosity, and physically threatening behavior towards Drs. Yuskevich, Ginsburg, and other staff at the Hospital grew more pervasive and more damaging to the working environment at the Hospital.

54.  For example, due to Aria's apparent indifference to Metcalf's conduct, Metcalf's bigoted statements toward Plaintiffs began with even greater vigor as Metcalf began to refer to Dr. Ginsburg as speaking "the Jews language" on multiple occasions.

55. In other instances, Metcalf made derogatory and vulgar comments about Dr. Yuskevich's Russian/Lithuanian heritage and Dr. Yuskevich's sex life with his wife.

56. On one occasion, on or about December 17, 2009, Dr. Metcalf told the OR staff that Yuskevich is "most probably in bed with Lisa [his wife], fucking her and doing what she wants him to do."

57. In addition, it was at or about this time that Metcalf started to mock the way Dr. Ginsburg walks due to a severe injury suffered while Dr. Ginsburg was serving in the Israeli Navy for which Dr. Ginsburg was honorably discharged as a "disabled veteran."   (As set forth herein, Dr. Metcalf perceived and/or regarded Dr. Ginsburg to be disabled and discriminated against him because of that perception.)

58. In other instances, Metcalf physically threatened Dr. Ginsburg and mentally tormented him.

59. For example, during one such occasion, when Dr. Ginsburg had been stuck with a needle from a patient with Hepatitis C, Metcalf started referring to Dr. Ginsburg as "yellow man" as he underwent repeated tests for Hepatitis C.

60. During a June, 2009 incident, Metcalf brandished his fist inches from Dr. Ginsburg's face, verbally assaulting him, stating "fuck you motherfucker, let's go finish this business outside now!"

61. Metcalf also began to physically threaten Dr. Yuskevich.

62. For example, on July 16, 2010, Dr. Yuskevich came into the Cardiothoracic OR to give Dr. Ginsburg a break during a procedure, at which time Metcalf verbally attacked Dr. Yuskevich and waived a bloody suction catheter inches from Dr. Yuskevich's face.

63. Metcalf's tormenting began to take a toll on Dr. Ginsburg's mental health as he began experiencing bouts of high blood pressure after dealing with Metcalf's extreme harassment and verbal assaults.

64. Similarly, as a result of Metcalf's conduct, Dr. Yuskevich continues to suffer from post-traumatic stress disorder ("PTSD").

65. During this same period of time, Aria also ignored reports from Drs. Ginsburg and Yuskevich about Metcalf's conduct negatively affecting patient care.

66. To protect the confidentiality of the patients involved, Plaintiffs have detailed the various incidents involving Metcalf's patient care in a separate document attached hereto as Exhibit O. (Contemporaneously with this Complaint, Plaintiffs are filing a Motion to file Exhibit O under seal.)

67. Each of the instances described in Exhibit O qualify as "serious events" and/or "incidents" within the meaning of Pennsylvania's MCARE statute and were reported to Aria's administrators by Plaintiffs in accordance with their obligations under MCARE.

68. Despite Plaintiffs' reports of the serious events and incidents set forth in Exhibit O, Aria never disciplined Metcalf or otherwise curtailed his hospital or surgical privileges.

69. In fact, when Plaintiffs began to report Metcalf's patient care issues to Aria's administrators, Aria retaliated against Plaintiffs as set forth herein.

70. Although administration at Aria, including Cliff Hall, Sue Abraham, Rafael Villalobos, Domenic Bucci, Marc Libasi, Kate Kinslow and Peter Farano, all told Drs. Ginsburg and Yuskevich that Metcalf's conduct would not be tolerated, Aria's administration refused to enforce their own internal Policies and Code of Conduct, which not only prohibited

Metcalf's conduct, but also clearly prohibited any retaliation against Plaintiffs for reporting such behavior.

71. In this regard, just as the targets of Metcalf's hostility were bound by Aria's Code of Conduct to report Metcalf's conduct to their superiors (and each of them did), so too were those same superiors bound to take disciplinary action against Metcalf for his hostile and bigoted behavior.

72. Specifically, Aria's Human Resources Policy and Procedure Manual ("HR Policy") provides that it is the Hospital's policy to "provide a safe and healthy working environment for employees", that "[t]hreats, threatening language, or any other acts of aggression or violence made to or by an employee will *not* be tolerated." (*See* Human Resources Policy and Procedure Manual attached hereto as Exhibit "I", p. 1.)

73. Aria's HR Policy also provides that employees "have a 'duty to warn' their managers, security personnel or Human Resources representatives of any … incidents that they observe … that appear problematic." (*Id.*)

74. Examples of such behavior include "[i]ndividuals displaying overt resentment, anger and hostility", "[i]ndividuals displaying signs of extreme stress", "[i]ndividuals making threats of bodily harm", and "[i]ndividuals becoming angry and withdrawn." (*Id.*)

75. Aria's Policy and Procedure Manual further provides that Frankford "will not condone any form of retaliation against any employee for making a report under this policy." (*Id.*)

76. Similarly, Aria's Policy Statement provides that "all Medical Staff members and Allied Health Professionals practicing in the Hospital must treat others with respect, courtesy, and dignity and conduct themselves in a professional and cooperative manner." (*See* Exhibit "J" hereto, Policy Statement, 1.)

77. The Policy Statement further provides that "[i]n dealing with all incidents of inappropriate conduct, the protection of patients, employees, physicians, and others in the Hospital and the orderly operation of the Medical Staff and Hospital are paramount concerns." (*Id.*)

78. Examples of "inappropriate conduct," according to the Policy Statement, include, but are not limited to the following:

- "threatening or abusive language directed at … [among others] nurses, Hospital personnel, Allied Health Professionals, or other physicians (e.g., belittling, berating, and/or non-constructive criticism that intimidates, undermines confident or implies incompetence)";

- "degrading or demeaning comments regarding patients or their visitors, nurses, Hospital personnel, Allied Health Professionals, other physicians, or the Hospital";

- "profanity or similarly offensive language while in the Hospital and/or while speaking with patients or their visitors, nurses, Hospital personnel, Allied Health Professional, or other physicians."

(*Id.*)

79. In violation of its own Code of Conduct and Policies, Aria continued to tolerate Metcalf's outrageous conduct, did nothing to enforce the Policies against Metcalf, and actually retaliated against Plaintiffs for making reports of Metcalf's discriminatory behavior and patient care issues.

14

80. Indeed, as a direct and proximate result of the stress and anxiety inflicted upon Dr. Ginsburg by Metcalf's harassment, threats, conduct toward patients (set forth in Exhibit O) and bigotry, Metcalf (with the support and knowledge of Aria's administration) retaliated against Dr. Ginsburg by forcing him on a temporary leave of absence with a requirement that he seek psychiatric help.

81. Shortly after Dr. Ginsburg returned to work from his temporary leave, he met with Sue Abraham (President of Aria) and Dr. Hall (Chief of Anesthesiology at Aria) and tearfully told them Metcalf had turned him into his "punching bag."

82. Dr. Ginsburg also told Aria administration that Metcalf had referred to him as speaking the "Jews Language" and that Metcalf had repeatedly harassed him about his disability.

83. Despite this meeting with the President of Aria and Chief of Aria's Anesthesiology Department, and despite Dr. Ginsburg's prior complaints about Metcalf's harassment and patient care issues, Aria's administration did nothing to discipline Metcalf or otherwise enforce its policies.

84. Although Drs. Ginsburg and Yuskevich began to realize that the working conditions at the Hospital created by Metcalf's bigoted behavior and Aria's deliberate refusal to enforce their own Policies and Code of Conduct would not change, as a last ditch effort to achieve a compromise whereby they would continue to work at the Hospital without being exposed to Metcalf, Drs. Ginsburg and Yuskevich scheduled a meeting for February 16, 2011 at 2:00 p.m. with Ron Kumor, Chief Operation Officer of Frankford and Vice President of the Hospital.

85. Drs. Ginsburg and Yuskevich requested the meeting in order to discuss the possibility of stopping Metcalf's abusive behavior.

86. At 1:50 p.m. on February 16, 2011 (the scheduled date of the meeting), Mr. Kumor called to cancel, and, despite Plaintiffs' requests, refused to reschedule.

87. While Plaintiffs continued to report to work for a period of time, the mental anguish, humiliation, and fear caused by Metcalf's actions and Aria's inactions had become so intolerable that both Plaintiffs found it difficult to report to work.

88. Thus, having had no assistance from Aria in correcting the hostile work environment caused by Metcalf, in July 2011, Dr. Ginsburg was constructively discharged from his employment and compelled to submit his written resignation to Aria.

89. In his written resignation, Dr. Ginsburg explained that, despite his multiple complaints and meetings with different levels of Aria's administration about Metcalf's conduct, the issues were "not resolved, nor adequately addressed," and he therefore had "no choice but to inform [Aria] that [his] last working day at Aria will be July 31, 2011." (*See* July 20, 2011 Ginsburg resignation letter attached as Exhibit "K.")

90. While Dr. Ginsburg had every intention of spending the rest of his career as an anesthesiologist at Frankford Hospital, Metcalf's conduct and Aria's tolerance of it forced Dr. Ginsburg into the difficult position of having to request only a two month extension to the term of his employment agreement instead of accepting the much longer and more desirable June 1, 2011 employment agreement that Aria had offered Dr. Ginsburg. (*Compare* amendment to employment agreement attached hereto as Exhibit "B" *with* unsigned June 1, 2011 employment agreement attached hereto as Exhibit "L.")

91. Likewise, on July 24, 2011, Dr. Yuskevich informed Aria's administration that he could no longer work with Metclaf due to the hostile and unsafe work environment described herein and Metcalf's patient care issues as fully described in Exhibit O (filed under seal).

16

92. Remarkably, in response to Dr. Yuskevich's complaints and pleas to be shielded from Metcalf, Aria demoted Dr. Yuskevich by placing him on "administrative leave," effective August 2, 2011, which was confirmed in a written letter to counsel.  (*See* August 5, 2011 Letter from Aria's Chief Legal Counsel attached as Exhibit "M.")

93. Dr. Yuskevich was never permitted to return to his position at Aria.

94. In August 2011, both Drs. Yuskevich and Ginsburg filed formal charges of employment discrimination with the EEOC and PHRC due to the hostile work environment caused by Metcalf.

95. After Dr. Yuskevich filed his EEOC and PHRC charges, in further retaliation against him, Aria refused to renew the term of his employment agreement, thereby terminating his employment in or about November 2011.  (Defendant's November 4, 2011 termination letter to Dr. Yuskevich is attached hereto as Exhibit "N.")

96. Further, after Dr. Ginsburg was constructively discharged, after he filed his EEOC and PHRC charges, and after he reported Metcalf's patient care issues set forth in Exhibit O (filed under seal), Defendants Aria HPS and Aria Health took further retaliatory action against him by refusing to provide him with an employment reference for purposes of Dr. Ginsburg's search for subsequent employment.

97. Even before filing their formal charges with the EEOC and PHRC, Plaintiffs made continuing efforts to resolve the dispute with Aria, but Aria's administration continued to refuse to enforce their own Policies and Code of Conduct and continued to defend Metcalf, resulting in Dr. Ginsburg's constructive discharge and Dr. Yuskevich's termination.

98. But for Metcalf's outrageous conduct and Aria's tolerance of it, Dr. Ginsburg would

have accepted the more desirable employment agreement that Aria had already offered to him at the time he determined that he could no longer work in and around Metcalf at the Hospital.

99. But for Metcalf's outrageous conduct and Aria's tolerance of it, Dr. Yuskevich would have continued to work at the Hospital and renewed the term of his employment agreements in the foreseeable future as he had done on each prior occasion.

100. As a direct and proximate result of the acts and omissions of Defendants, Drs. Ginsburg and Yuskevich have lost the valuable consideration to which they are entitled under their employment agreements with Aria including, but not limited to their substantial salaries, employer provided health insurance, life insurance, long term disability insurance, pension benefits, and opportunity for advancement and additional compensation. (*See* Exhibits "A", "B", and "C" hereto.)

101. As a direct and proximate result of the actions and inactions of all Defendants, Drs. Ginsburg and Yuskevich have suffered and continue to suffer severe and pervasive emotional distress including but not limited to loss of sleep, anxiety, heart palpitations, PTSD and other damages to be proven at trial.

## COUNT I
### (PLAINTIFFS v. ARIA HPS and ARIA HEALTH)
### (TITLE VII – HOSTILE WORK ENVIRONMENT)

102. Plaintiffs incorporate all other paragraphs of this Complaint as though the same were set forth at length herein.

103. Both Drs. Ginsburg and Yuskevich are members of a "protected class" in that both are ethnically Jewish, Dr. Ginsburg is an Israeli immigrant, and Dr. Yuskevich's heritage is Russian and Lithuanian.

104. As set forth fully above, both Drs. Ginsburg and Yuskevich were intentionally

discriminated against by Metcalf because of their membership in a "protected class."

105.   Dr. Ginsburg was discriminated against due to his Jewish and Israeli heritage, while Dr. Yuskevich was discriminated against as a result of his Jewish and Russian/Lithuanian heritage.

106.   As set forth fully above, the intentional discrimination against Drs. Ginsburg and Yuskevich was regular and pervasive and created a hostile work environment in that it occurred on a daily basis over several years during their employment at Aria HPS and Aria Health and entailed repeated instances of verbal abuse and threats of violence against Plaintiffs, all of which was motivated by Metcalf's animosity against Plaintiffs' due to their memberships in a protected class.

107.   Metcalf's intentional discrimination against Plaintiffs detrimentally affected them in that they have suffered and continue to suffer severe and pervasive emotional distress, including, but not limited to loss of sleep, anxiety, heart palpitations, and PTSD.

108.   Metcalf's intentional discrimination against Plaintiffs also detrimentally affected their employment status with Aria HPS and Aria Health.

109.   As a result of Metcalf's intentional discrimination, Dr. Ginsburg was forced on temporary psychiatric leave and ultimately was constructively discharged from Aria HPS and Aria Health's employ due to the hostile work environment caused by Methcalf's discriminatory conduct.

110.   Likewise, as a result of Metcalf's intentional discrimination, Dr. Yuskevich's employment was terminated when Aria HPS and Aria Health forced him on "administrative leave" and thereafter refused to renew the term of his employment agreement.

111.   Metcalf's intentional discrimination was so severe, pervasive and outrageous as

fully set forth herein that it would have detrimentally affected a reasonable person in the same position as Plaintiffs.

112.    When intentionally discriminating against Plaintiffs, Metcalf was the Chief of Aria's Cardiothoracic Surgery Department, and at all times material hereto he was acting within the course and scope of his employment with Aria HPS and Aria Health.

113.    Aria HPS and Aria Health are vicariously liable under the doctrine of *respondent superior* for the intentional discrimination of Metcalf.

114.    As a direct and proximate result of the hostile work environment caused by Metcalf's intentional discrimination, both Plaintiffs have suffered physical injuries and severe emotional distress.

115.    As a direct and proximate result of the hostile work environment caused by Metcalf's intentional discrimination, both Plaintiffs have suffered tangible employment prejudice, including, but not limited to lost employment, demotion, lost employment opportunities, lost opportunity for advancement, and other damages to be proven at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants Aria HPS and Aria Health, jointly and severally, for an amount in excess of $150,000, along with attorneys' fees, costs, punitive damages and all such other relief as the Court deems equitable and just.

### COUNT II
### (PLAINTIFFS v. ARIA HPS and ARIA HEALTH)
### (TITLE VII – RETALIATION FOR REPORTING
### HOSTILE WORK ENVIRONMENT)

116.    Plaintiffs incorporate all other paragraphs of this Complaint as though the same were set forth at length herein.

117.    During the course and scope of their employment with Aria HPS and Aria Health, Drs. Ginsburg and Yuskevich engaged in protected employee activities by, among other things, abiding by Aria's Code of Conduct in reporting Metcalf's intentional discriminatory conduct to the administration at Aria and filing formal charges with the EEOC and PHRC.

118.    At or about the time that Plaintiffs reported Metcalf's discriminatory conduct to Aria administration, Aria took adverse employment action against Dr. Ginsburg by forcing him to take a leave of absence with the requirement that he obtain psychiatric care.

119.    Likewise, after Dr. Yuskevich reported Metcalf's discriminatory conduct Aria took adverse employment action against Dr. Yuskevich by forcing him on "administrative leave."

120.    In addition, after Dr. Yuskevich filed formal charges with the EEOC and PHRC, Aria took further adverse employment action by refusing to extend the term of Dr. Yuskevich's employment agreement, and thereby terminating his employment relationship with Aria.  (*See* 11/4/2011 letter from Frankford to Dr. Yuskevich attached hereto as Exhibit "N")

121.    But for Dr. Ginsburg engaging in the protected activity of reporting Metcalf's discriminatory conduct to Aria's administration in compliance with Aria's Code of Conduct and reporting Metcalf's patient care issues as set forth in Exhibit O (filed under seal), Aria HPS and Aria Health would not have taken the adverse employment action of forcing Dr. Ginsburg to take a psychiatric leave of absence.

122.    But for Dr. Yuskevich engaging in the protected activity of reporting Metcalf's

discriminatory conduct to Aria's administration in compliance with Aria's Code of Conduct, reporting Metcalf's patient care issues as set forth in Exhibit O (filed under seal), and  filing his complaints with the EEOC and PHRC, Aria HPS and Aria Health would not have taken the adverse employment action of terminating Dr. Yuskevich's employment.

123.    As a direct and proximate result of the retaliation by Aria HPS and Aria Health against Plaintiffs stemming from their protected activities, Plaintiffs have suffered physical injuries and severe emotional distress.

124.    As a direct and proximate result of the retaliation by Aria HPS and Aria Health against Plaintiffs stemming from their protected activities, Plaintiffs have suffered tangible employment prejudice, including, but not limited to lost employment, demotion, lost employment opportunities, lost opportunity for advancement, and other damages to be proven at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants Aria HPS and Aria Health, jointly and severally, for an amount in excess of $150,000, along with attorneys' fees, costs, punitive damages and all such other relief as the Court deems equitable and just.

### COUNT III
### (PLAINTIFF GINSBURG v. ARIA HPS AND ARIA HEALTH)
### (ADA – HOSTILE WORK ENVIRONMENT)

125.    Plaintiff Ginsburg incorporates all other paragraphs of this Complaint as though the same were set forth at length herein.

126.    As set for more fully above, Defendant Metcalf regarded Plaintiff Dr. Ginsburg as being disabled within the meaning of the ADA.

127.    Because Metcalf regarded Dr. Ginsburg's limp as substantially limiting his major

life activity of walking, Dr. Ginsburg qualifies as a disabled individual within the meaning of the ADA.

128.    In addition, aside from Metcalf regarding Dr. Ginsburg as disabled, Dr. Ginsburg qualifies as a disabled individual under the ADA as he was discharged from the Israeli Navy as a "disabled veteran" and as a result of such disability he is substantially limited in the major life activity of walking.

129.    As set forth above, Dr. Ginsburg was subject to repeated and unwelcomed harassment by Metcalf due to his disability.

130.    Metcalf's harassment was sufficiently severe and/or pervasive to alter the conditions of Dr. Ginsburg's employment and to create an abusive working environment in that Metcalf repeatedly over an extended period of time subjected Dr. Ginsburg to harassment concerning his disability.

131.    Aria HPS and Aria Health, Dr. Ginsburg's employers, knew of the harassment by Metcalf but failed to take prompt, effective remedial action to prevent such harassment.

132.    As a direct and proximate result of the hostile work environment created by Metcalf's repeated harassment of Dr. Ginsburg concerning his disability, Dr. Ginsburg was constructively discharged, has sustained the injuries, damages, and losses set forth herein and has incurred attorneys' fees and costs associated with bringing this claim.

**WHEREFORE**, Plaintiff Dr. Ginsburg demands judgment in his favor and against Defendants Aria HPS and Aria Health, jointly and severally, for an amount in excess of $150,000, along with punitive damages, attorneys' fees, costs, and all such other relief as the Court deems equitable and just.

**COUNT IV**
**(PLAINTIFF GINSBURG v. ARIA HPS and ARIA HEALTH)**
**(ADA – RETALIATION)**

133.    Plaintiff Ginsburg incorporates all other paragraphs of this Complaint as though the same were set forth at length herein.

134.    As fully set forth herein, Dr. Ginsburg engaged in a protected activity under the ADA by lodging complaints with Aria's administration about the hostile work environment created by Metcalf's repeated harassment of Dr. Ginsburg related to his disability.

135.    After or contemporaneously with Dr. Ginsburg's complaints concerning Metcalf's harassment, Aria took adverse employment action against Dr. Ginsburg by forcing him on administrative leave, forcing him into psychiatric counseling, and ultimately forcing him to continue to work in the hostile work environment with Metcalf which caused Dr. Ginsburg's constructive discharge.

136.    As a direct and proximate result of Dr. Ginsburg's protected activity in lodging complaints regarding Metcalf's harassment, Aria took the aforementioned adverse employment actions against Dr. Ginsburg.

137.    As a direct and proximate result of the retaliation by Aria HPS and Aria Health against Dr. Ginsburg stemming from his protected activities, he has suffered physical injuries and severe emotional distress.

138.    As a direct and proximate result of the retaliation by Aria HPS and Aria Health against Dr. Ginsburg stemming from their protected activities, he has suffered tangible employment prejudice, including, but not limited to lost employment, demotion, lost

24

employment opportunities, lost opportunity for advancement, and other damages to be proven at trial.

**WHEREFORE**, Plaintiff Dr. Ginsburg demands judgment in his favor and against Defendants Aria HPS and Aria Health, jointly and severally, for an amount in excess of $150,000, along with punitive damages, attorneys' fees, costs, and all such other relief as the Court deems equitable and just.

**COUNT V**
**(PLAINTIFFS v. ARIA HPS and ARIA HEALTH)**
**(PHRA – HOSTILE WORK ENVIRONMENT DUE TO NATIONAL ORIGIN)**

139.    Plaintiffs incorporate all other paragraphs of this Complaint as though the same were set forth at length herein.

140.    Both Drs. Ginsburg and Yuskevich are members of a "protected class" as set forth herein.

141.    As set forth fully above, both Drs. Ginsburg and Yuskevich were intentionally discriminated against by Metcalf because of their membership in a "protected class."

142.    As set forth fully above, the intentional discrimination against Drs. Ginsburg and Yuskevich was regular and pervasive and created a hostile work environment in that it occurred on a daily basis over several years during their employment at Aria HPS and Aria Health and entailed repeated instances of verbal abuse and threats of violence against Plaintiffs, all of which was motivated by Metcalf's animosity against Plaintiffs' due to their memberships in a protected class.

143.    Metcalf's intentional discrimination against Plaintiffs detrimentally affected them in that they have suffered and continue to suffer severe and pervasive emotional distress, including, but not limited to loss of sleep, anxiety, heart palpitations, and PTSD.

144.    Metcalf's intentional discrimination against Plaintiffs also detrimentally affected their employment status with Aria HPS and Aria Health.

145.    As a result of Metcalf's intentional discrimination, Dr. Ginsburg was forced on temporary psychiatric leave and ultimately was constructively discharged from Aria HPS and Aria Health's employ due to the hostile work environment caused by Methcalf's discriminatory conduct.

146.    Likewise, as a result of Metcalf's intentional discrimination, Dr. Yuskevich's employment was terminated when Aria HPS and Aria Health forced him on "administrative leave" and thereafter refused to renew the term of his employment agreement.

147.    Metcalf's intentional discrimination was so severe, pervasive and outrageous as fully set forth herein that it would have detrimentally affected a reasonable person in the same position as Plaintiffs.

148.    When intentionally discriminating against Plaintiffs, Metcalf was the Chief of Aria's Cardiothoracic Surgery Department, and at all times material hereto he was acting within the course and scope of his employment with Aria HPS and Aria Health.

149.    Aria HPS and Aria Health are vicariously liable under the doctrine of *respondent superior* for the intentional discrimination of Metcalf.

150.    As a direct and proximate result of the hostile work environment caused by Metcalf's intentional discrimination, both Plaintiffs have suffered physical injuries and severe emotional distress.

151.    As a direct and proximate result of the hostile work environment caused by

Metcalf's intentional discrimination, both Plaintiffs have suffered tangible employment prejudice, including, but not limited to lost employment, demotion, lost employment opportunities, lost opportunity for advancement, and other damages to be proven at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants Aria HPS and Aria Health, jointly and severally, for an amount in excess of $150,000, along with attorneys' fees, costs, and all such other relief as the Court deems equitable and just.

**COUNT VI**
**(PLAINTIFFS v. ARIA HPS, ARIA HEALTH, METCALF)**
**(PHRA – RETALIATION FOR REPORTING**
**HOSTILE WORK ENVIRONMENT DUE TO NATIONAL ORIGIN**
**DISCRIMINATION)**

152.    Plaintiffs incorporate all other paragraphs of this Complaint as though the same were set forth at length herein.

153.    During the course and scope of their employment with Aria HPS and Aria Health, Drs. Ginsburg and Yuskevich engaged in protected employee activities by reporting Metcalf's intentional discriminatory conduct to the administration at Aria and filing formal charges with the EEOC and PHRC.

154.    At or about the time that Plaintiffs reported Metcalf's discriminatory conduct to Aria administration, Aria took adverse employment action against Dr. Ginsburg by forcing him to take a leave of absence with the requirement that he obtain psychiatric care.

155.    Likewise, after Dr. Yuskevich reported Metcalf's discriminatory conduct Aria took adverse employment action against Dr. Yuskevich by forcing him on "administrative leave."

156.    In addition, after Dr. Yuskevich filed formal charges with the EEOC and PHRC,

Aria took further adverse employment action by refusing to extend the term of Dr. Yuskevich's employment agreement, and thereby terminating his employment relationship with Aria. (*See* 11/4/2011 letter from Frankford to Dr. Yuskevich attached hereto as Exhibit "N.")

157.    After Plaintiffs' reported Metcalf's discriminatory conduct to Aria, Metcalf retaliated against Plaintiffs by taking various forms of adverse employment actions against Plaintiffs by escalating his harassment against Plaintiffs in the workplace, encouraging Aria HPS and Aria Health to place Plaintiffs on administrative leave and not to renew the term of Dr. Yuskevich's employment agreement.

158.    But for Plaintiffs engaging in the aforementioned protected activities, which included reporting Metcalf's discriminatory conduct and patient care issues set forth in Exhibit O, Defendants would not have taken the adverse employment action set forth herein.

159.    As a direct and proximate result of the retaliation by Aria HPS, Aria Health and Metcalf stemming from Plaintiffs' protected activities, Plaintiffs have suffered physical injuries and severe emotional distress.

160.    As a direct and proximate result of the retaliation by Aria HPS, Aria Health and Metcalf stemming from Plaintiffs protected activities, Plaintiffs have suffered tangible employment prejudice, including, but not limited to lost employment, demotion, lost employment opportunities, lost opportunity for advancement, and other damages to be proven at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against all Defendants, jointly and severally, for an amount in excess of $150,000, along with attorneys' fees, costs, and all such other relief as the Court deems equitable and just.

**COUNT VII**
**(PLAINTIFF GINSBURG v. ARIA HPS AND ARIA HEALTH)**
**(PHRA– HOSTILE WORK ENVIRONMENT DUE TO DISABILITY**
**DISCRIMINATION)**

161.    Plaintiff Ginsburg incorporates all other paragraphs of this Complaint as though the same were set forth at length herein.

162.    As set for more fully above, Metcalf regarded Plaintiff Dr. Ginsburg as being disabled within the meaning of the ADA and PHRA.

163.    Because Metcalf regarded Dr. Ginsburg's limp as substantially limiting his major life activity of walking, Dr. Ginsburg qualifies as a disabled individual within the meaning of the ADA and PHRA.

164.    In addition, aside from Metcalf regarding Dr. Ginsburg as disabled, Dr. Ginsburg qualifies as a disabled individual under the ADA and PHRA because he was discharged from the Israeli Navy as a "disabled veteran" and as a result of such disability he is substantially limited in the major life activity of walking.

165.    As set forth above, Dr. Ginsburg was subject to repeated and unwelcomed harassment by Metcalf due to his disability.

166.    Metcalf's harassment was sufficiently severe and/or pervasive to alter the conditions of Dr. Ginsburg's employment and to create an abusive working environment in that Metcalf repeatedly over an extended period of time subjected Dr. Ginsburg to harassment concerning his disability.

167.    Aria HPS and Aria Health, Dr. Ginsburg's employers, knew of the harassment by Metcalf but failed to take prompt, effective remedial action to prevent such harassment.

168.    As a direct and proximate result of the hostile work environment created by

Metcalf's repeated harassment of Dr. Ginsburg concerning his disability, Dr. Ginsburg was constructively discharged, has sustained the injuries, damages, and losses set forth herein and has incurred attorneys' fees and costs associated with bringing this claim.

**WHEREFORE**, Plaintiff Dr. Ginsburg demands judgment in his favor and against Defendants Aria HPS and Aria Health, jointly and severally, for an amount in excess of $150,000, attorneys' fees, costs, and all such other relief as the Court deems equitable and just.

## COUNT VIII
### (PLAINTIFF GINSBURG v. ARIA HPS, ARIA HEALTH and METCALF)
### (PHRA – RETALIATION FOR REPORTING DISABILITY DISCRIMINATION)

169.     Plaintiff Ginsburg incorporates all other paragraphs of this Complaint as though the same were set forth at length herein.

170.     As fully set forth herein, Dr. Ginsburg engaged in a protected activity under the PHRA by lodging complaints with Aria's administration about the hostile work environment created by Metcalf's repeated harassment of Dr. Ginsburg related to his disability.

171.     After or contemporaneously with Dr. Ginsburg's complaints concerning Metcalf's harassment related to his disability, Aria took adverse employment action against Dr. Ginsburg by forcing him on administrative leave, forcing him into psychiatric counseling, and ultimately forcing him to continue to work in the hostile work environment with Metcalf which caused Dr. Ginsburg's constructive discharge.

172.     After or contemporaneously with Dr. Ginsburg's complaints concerning Metcalf's harassment related to his disability, Metcalf retaliated against Dr. Ginsburg by taking various forms of adverse employment actions against Plaintiffs by escalating his harassment against Dr. Ginsburg in the workplace and encouraging Aria HPS and Aria Health to  place Dr. Ginsburg on administrative leave and into psychiatric counseling.

173.    As a direct and proximate result of Dr. Ginsburg's protected activity in lodging complaints regarding Metcalf's harassment, Defendants took the aforementioned adverse employment actions against Dr. Ginsburg.

174.    As a direct and proximate result of the retaliation by Defendants against Dr. Ginsburg stemming from his protected activities, he has suffered physical injuries and severe emotional distress.

175.    As a direct and proximate result of the retaliation by Defendants against Dr. Ginsburg stemming from their protected activities, he has suffered tangible employment prejudice, including, but not limited to lost employment, demotion, lost employment opportunities, lost opportunity for advancement, and other damages to be proven at trial.

**WHEREFORE**, Plaintiff Dr. Ginsburg demands judgment in his favor and against all Defendants, jointly and severally, for an amount in excess of $150,000, attorneys' fees, costs, and all such other relief as the Court deems equitable and just.

**COUNT IX**
**(PLAINTIFFS v. ARIA HPS and ARIA HEALTH)**
**(BREACH OF CONTRACT)**

176.    Plaintiffs incorporate all other paragraphs of this Complaint as though the same were set forth at length herein.

177.    As set forth more fully above, Plaintiffs' employment with Aria HPS and Aria Health was subject to the terms of employment agreements, both of which provided, among other things, that Plaintiffs were bound to abide by "all policies, procedures and directives" of Aria HPS and Aria Health, which included the HR Policy (Exhibit "I") and Policy Statement (Exhibit "J").  (*See* Exhibits A and C, Employment Agreement at § 2.8.)

178.    Plaintiffs' employment agreement, like all contracts in Pennsylvania, also

contained implied covenants requiring the parties to deal fairly with each other and in good faith.

179.    Part of the implied covenant of good faith of Plaintiffs' employment agreements included an implied promise of Aria HPS and Aria Health, as Plaintiffs' employers, to fully comply with their own HR Policy and Policy Statement, both of which were fully incorporated by reference into Plaintiffs' employment agreements.

180.    Thus, as part of their implied covenant of good faith, Aria HPS and Aria Health were contractually obligated to fully comply with their HR Policy and Policy Statement, which required Defendants to:

- "provide a safe and healthy working environment for employees" (*See* Exhibit "I", p. 1.)

- not tolerate "[t]hreats, threatening language, or any other acts of aggression or violence made to or by an employee.  (*See Id.*)

- "not condone any form of retaliation against any employee for making a report under this policy."  (*Id.*)

181.    Aria HPS and Aria Health were also contractually obligated, in accordance with their Policy Statement,  to make it their "paramount concern" to "protect patients, employees, physicians, and others in the Hospital and the orderly operation of the Medical Staff and Hospital" when "dealing with all incidents of inappropriate conduct." (Exhibit J, Policy Statement at p. 1.)

182.    "Inappropriate conduct," as defined by Defendants' Policy Statement, includes, but is not limited to:

- "threatening or abusive language directed at … [among others] nurses, Hospital personnel, Allied Health Professionals, or other physicians (e.g., belittling, berating, and/or non-constructive criticism that intimidates, undermines confident or implies incompetence)";

- "degrading or demeaning comments regarding patients or their visitors, nurses, Hospital personnel, Allied Health Professionals, other physicians, or the Hospital";

- "profanity or similarly offensive language while in the Hospital and/or while speaking with patients or their visitors, nurses, Hospital personnel, Allied Health Professional, or other physicians."

(*Id.*)

183.   The aforementioned Policies, incorporated into Plaintiffs' employment agreements, were all material terms of Plaintiffs' employment on which Plaintiffs justifiably relied in agreeing to practice medicine as employees of Defendants.

184.   As set forth fully above, Defendants materially breached their implied covenants of good faith by repeatedly failing to comply with their own HR Policy and Policy Statement in that they failed to "provide a safe and healthy working environment for employees," tolerated Metcalf's "[t]hreats, threatening language, [and] other acts of aggression or violence," condoned "retaliation against [Plaintiffs] for making reports under the policy," and failed to make it their "paramount concern" to protect Plaintiffs and patients from Metcalf's "inappropriate conduct."

185.   As a direct and proximate result of Defendants materially breaching their implied contractual obligations to fully comply with their HR Policy and Policy Statement, Plaintiffs have suffered severe damages as set forth more fully herein, including, but not limited to lost employment, demotion, lost employment opportunities, lost opportunity for advancement, and other damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendants Aria HPS and Aria Health, jointly and severally, for an amount in excess of $150,000, along with costs of suit, and all such other relief as the Court deems equitable and just.

**COUNT X**
**(PLAINTIFFS v. DEFENDANS ARIA HPS and ARIA HEALTH)**
**(VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW)**

186.    Plaintiffs incorporate all other paragraphs of this Complaint as though the same were set forth at length herein.

187.    As set forth more fully above, Plaintiffs reported many instances qualifying as either "serious events" or "incidents" under Pennsylvania's Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. § 1303.308, involving Metcalf's patient care, all of which are set forth in Exhibit O filed under seal with this Complaint.

188.    As set forth fully above, Defendants Aria HPS and Aria Health took illegal retaliatory action against Plaintiffs for reporting the many "serious events" and "incidents" involving Metcalf's patients under Pennsylvania's MCARE, 40 P.S. § 1303.308.

189.    MCARE obligates "health care workers," like Plaintiffs, to report "serious events" or" incidents" involving patient care to "medical facilities," like Aria, as part of MCARE's comprehensive plan to reduce medical negligence and increase patient safety in Pennsylvania's hospitals and medical facilities.  40 P.S. § 1303.308(a).

190.    In this regard, the MCARE statute provides that:

> A health care worker who reasonably believes that a serious event
> or incident has occurred shall report the serious event or incident
> according to the patient safety plan of the medical facility unless
> the health care worker knows that a report has already been made.

191.    The MCARE statute makes it unlawful for a medical facility like Aria to subject a health care worker like Plaintiffs to "any retaliatory action" for reporting "serious events or incidents" relating to patient care.  40 P.S. § 1308.303(c).

192.    The MCARE statute, 40 P.S. § 1308.308(c), also specifically states that health care workers who make reports of "serious events" or "incidents" shall have the full protection and remedies available under Pennsylvania's Whistleblower Law:

> A health care worker who reports the occurrence of a serious event or incident in accordance with subsection (a) or (b) shall not be subject to any retaliatory action for reporting the serious event or incident and shall have the protections and remedies set forth in the act of December 12, 1986 (P.L. 1559, No. 169), known as the Whistleblower Law.

193.    The Whistleblower Law provides, *inter alia,* that "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee ... because the employee ... makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of *wrongdoing* or waste." 43 P.S. § 1423(a).

194.    "Employee" under the Whistleblower Law is defined as "[a] person who performs a service for wages or other remuneration under a contract of hire ... for a public body." 43 P.S. § 1422.

195.    Plaintiffs qualify as "Employees" under the Whistleblower Law because they are statutorily given that status under the MCARE statute and because Defendants Aria HPS and Aria Health are "public bodies" within the meaning of Pennsylvania's Whistleblower Law in that, upon information and belief, they both receive Commonwealth funds by way of Medicare and/or Medicaid payments.

196.    In reporting Metcalf's "serious events" and/or "incidents" as defined by the MCARE statute (including, but not limited those events and incidents set forth in Exhibit O), Plaintiffs were making a report of "wrongdoing" within the meaning of the Whistleblower Law.

197.     In direct violation of MCARE and the Whistleblower Law, Aria retaliated against Plaintiffs for reporting Metcalf's "serious events" and "incidents," which ultimately resulted in both Plaintiffs losing their employment and staff privileges at Aria as set forth more fully above.

198.     As direct and proximate result of Defendants Aria HPS and Aria Health retaliating against Plaintiffs due to their reporting "wrongdoing" associated with Metcalf's "serious events" and/or "incidents" under MCARE, Plaintiffs have suffered actual damages as set forth more fully herein, including, but not limited to lost employment, demotion, lost employment opportunities, lost opportunity for advancement, and other damages to be proven at trial.

199.     As a direct and proximate result of Defendants Aria HPS and Aria Health retaliating against Plaintiffs due to their reporting "wrongdoing" associated with Metcalf's "serious events" and/or "incidents" under MCARE, Plaintiffs have suffered severe emotional distress and bodily injury.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants Aria HPS and Aria Health for an amount in excess of $150,000, along with punitive damages, attorneys' fees, costs, and all such other relief as the Court deems equitable and just.

### COUNT XI
### (PLAINTIFFS v. DEFENDANT METCALF)
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

200.     Plaintiffs incorporate all other paragraphs of this Complaint as though the same were set forth at length herein.

201.     As set forth more fully above, during the course of Plaintiffs' employment with

Aria HPS and Aria Health, on an ongoing basis, Metcalf engaged in extreme and outrageous conduct, including not only the severe and pervasive harassment related to Plaintiffs' ethnicity, national origin, and disability, but also in connection with the many "serious events" and "incidents" fully set forth in Exhibit O hereto.

202.    Metcalf's conduct was reckless, intentional and outrageous.

203.    As a direct and proximate result of Metcalf's conduct, Plaintiffs suffered and continue to suffer severe emotional distress and bodily injury including but not limited to PTSD, loss of sleep, anxiety, and heart palpitations.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant Randy Metcalf for an amount in excess of $150,000, along with punitive damages, costs, and all such other relief as the Court deems equitable and just.

**COUNT XII**
**(PLAINTIFF YUSKEVICH V. DEFENDANT METCALF)**
**(ASSAULT/BATTERY)**

204.    Plaintiffs incorporate all other paragraphs of this Complaint as though the same were set forth at length herein.

205.    As set forth above, on July 16, 2010, Metcalf assaulted Dr. Yuskevich in the Cardiothoracic OR at Frankford Hospital during a procedure, at which time Metcalf began threatening physical bodily harm to Dr. Yuskevich in a fit of anger, while waving a large, bloody medical instrument --a suction catheter -- inches from Dr. Yuskevich's face.

206.    As a result of Metcalf's statements, threats and the overt act of waving a large, bloody medical instrument inches from Dr. Yuskevich's face, Dr. Yuskevich had a reasonable apprehension of an immediate battery.

207.    By physically threatening Dr. Yuskevich while waving a large instrument in Dr.

Yuskevich's face, Metcalf committed an assault on Dr. Yuskevich.

208.    As a direct and proximate result of Metcalf assaulting him, Dr. Yuskevich was in fear of immediate bodily harm and suffered severe emotional distress.

209.    Metcalf's assault on Dr. Yuskevich was done intentionally with the specific purpose of causing Dr. Yuskevich to fear immediate bodily harm.

**WHEREFORE**, Plaintiff Dr. Yuskevich demands judgment in his favor and against Defendant Randy Metcalf for an amount in excess of $150,000, along with punitive damages, costs, and all such other relief as the Court deems equitable and just.

## <u>JURY DEMAND</u>

Plaintiffs demand trial by a jury of twelve on all claims to which they are entitled.

Respectfully submitted,

3/2/12                                       s/   George Bochetto

Dated: _____          By:   _____
                                        George Bochetto, Esquire
                                        Gavin P. Lentz, Esquire
                                        **BOCHETTO & LENTZ, P.C.**
                                        1524 Locust Street
                                        Philadelphia, PA 19102
                                        (215) 735-3900